IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Anthony Eppse, *et al.*,	Case No. 3:17CV1166

    Plaintiffs

    v.	**ORDER**

General Motors, LLC, *et al.*,

    Defendants

This is a labor dispute.

Plaintiffs Anthony Eppse, Gregory Matter, and Kenneth Biggert formerly worked at a Sandusky, Ohio roller bearings plant that defendant General Motors, LLC (GM) owned. GM ran the plant through its then-subsidiary, Delphi, until GM spun off Delphi in 1999.

Following the spinoff, defendant International Union, United Automobile, Aerospace and Agricultural Implement Workers (UAW or the union), which represented the Sandusky plant workers, negotiated a "Flowback Agreement" with GM and Delphi. The Flowback Agreement provided that Delphi employees, if laid off, could "flowback" to a GM plant without losing seniority. Each plaintiff applied for flowback, but GM rejected their requests because it had deleted their applications from its records in a 2006 "purge."

Plaintiffs sue defendants under the Labor Management Relations Act, 29 U.S.C. § 185, (LMRA). Their "hybrid" claim alleges that 1) GM breached the Flowback Agreement when it purged their flowback applications and denied them flowback opportunities; and 2) the UAW violated its duty of fair representation (DFR) by failing to investigate GM's alleged breach.

Jurisdiction is proper pursuant to 29 U.S.C. § 185(c).

1

Now pending are GM's motion for summary judgment (Doc. 20) and the UAW's motion for summary judgment (Doc. 21). For the reasons that follow, I grant the motions.

**Background**

**I. Sandusky Plant Bargaining Relationship and Flowback Agreement**

GM operated the Sandusky plant through its subsidiary, Delphi, until the 1999 spinoff. (*See* Doc. 20-3 at 12:1-3; Doc. 20-4 at 6:25, 7:1-25). Thereafter, Delphi assumed the latest collective bargaining agreement (CBA) between GM and the UAW via a contract settlement agreement signed September 30, 1999. (*See* Doc. 20-6 at 388).

The contract settlement agreement included the "UAW – GM – Delphi Flowback Agreement." (*See* Doc. 20-6 at 401). The Flowback Agreement provided employees the opportunity to "move from GM to Delphi and from Delphi to GM," (*i.e.*, "flow" from, for example, the Sandusky plant to another, GM-owned, plant). (*Id.* at 401-406, ¶ 25).

An employee desiring to flow from one plant to another had to apply through GM's Employee Placement System (EPS). (*See id.* at 12-16). Then, 1) a job must open at the employee's desired plant; 2) GM must decide to fill the opening; 3) the applicant must rank higher than all other applicants *per* the priorities set in the Flowback Agreement;[1] 4) GM must offer the employee the position; and 5) the employee must accept. (Doc. 20-7 at 4, ¶ 11).

While negotiating the 2003 CBA, GM and the UAW agreed that GM could annually delete, or "purge," applications from EPS. (*See* Doc. 20-7 at 3, ¶ 6). Plaintiffs allege that neither defendant told them about the possibility of a purge. (Doc. 5 at 9, ¶ 41).

---

[1] Appendix A of the Flowback Agreement sets out a series of factors that prioritize one applicant for flowback over another. (*See* Doc. 20-7 at 4-5, ¶ 11).

## II. Plaintiffs' Employment and Flowback Applications

Plaintiffs Biggert, Matter, and Eppse began working at the Sandusky plant on June 17, 1991, September 30, 1999, and October 18, 1999, respectively. (Doc. 20-3 at 11:5-10; Doc.20-4 at 6:19-20; Doc. 20-5 at 6:16). They applied for flowback on September 7, 2004 (Matter), October 17, 2005 (Biggert), and October 18, 2005 (Eppse). (*See* Doc. 20-6 at 11, 414; 419, ¶ 10).

At the end of 2006, GM's National Employee Placement Center (NEPC), which administers the EPS, purged all flowback applications, including plaintiffs', dated before December 1, 2005. (*See* Doc. 20-3 at 78:5-8; Doc. 20-6 at 21). A 2007 memorandum of understanding required "[e]mployees on roll prior to October 8, 2005 . . . without a valid flowback application" to apply for flowback by October 1, 2007. (*See* Doc. 5-1 at 1-46).

Plaintiffs did not submit new applications before October 1, 2007. (*See* Doc. 20-3 at 41:9-9-15; Doc. 20-4 at 23:1-5; Doc. 20-5 at 38:19-25, 39:1-4). They learned years after the late-2006 purge that GM had deleted their applications.[2]

### A. Plaintiffs' Informal Efforts With the UAW

Sometime in 2011 or 2012,[3] after learning about the purge, Eppse led an effort to revive plaintiffs' applications. He first worked with local UAW representatives, who "attempted to rectify the issues throughout international UAW from region to" the then-international assistant

---

[2] The record is unclear regarding the exact date each plaintiff learned that GM purged his application. Eppse complained to the local union about flowback sometime in 2011 or 2012. (Doc. 20-3 at 69:6-12; Doc. 20-4 at 151). He testified, however, that he learned during a 2012 phone call with GM Labor Relations that NEPC purged his application. (Doc. 20-4 at 19:12-16, 20:9-25). Biggert and Matter both testified that they learned in 2013 that GM purged their applications. (Doc. 20-3 at 20:19-25, 22:17-18; Doc. 21-2 at 34:9-23).

[3] Biggert testified that plaintiffs first sought help from the local union in 2011 (*see* Doc. 20-3 at 170:17-23), but Eppse testified that he first contacted the local union for help in 2012 (*see* Doc. 20-4 at 151).

3

director. (Doc. 20-6 at 19-20; Doc. 20-3 at 69:19-25, 70:1-2; 20-4 at 151:12-22). The "local [representatives] came back distraught and said they could not get anywhere . . . and there was nothing they could do." (Doc. 20-6 at 19-20; Doc. 20-3 at 70:18-23; Doc. 20-4 at 151:12-22).

Eppse documented the local representatives' failed efforts in a June 3, 2015 email to UAW regional directorship. (*See* Doc. 20-6 at 19-20). His email asked the regional director and assistant director to help plaintiffs "resolve [their flowback issue] the old fashion way thru the union." (*Id.*).

Then, on September 29, 2015, Eppse approached UAW Sourcing Director Ruben Flores for assistance during Flores's visit to Sandusky on an unrelated matter. (*See* Doc. 20-4 at 123:1-16). Hearing plaintiffs' situation, Flores initially told Eppse that plaintiffs "had to [have] do[ne] something wrong," but, on hearing more details, Flores promised to "get this taken care of." (*Id.* at 123:17-25).

Eppse subsequently exchanged emails with Flores about plaintiffs' flowback concerns. Then, on Eppse's request, Flores met with UAW members on November 24, 2015 to address the issue. (*See* Doc. 21-14; Doc. 20-4 at 307:12-21). At that meeting, Eppse gave Flores documentation supporting his and others' requests for flowback. (*See* Doc. 21-15; Doc. 20-4 at 307:12-21). Flores subsequently redirected Eppse to other UAW contacts. (Doc. 20-4 at 322; Doc. 20-6 at 441-42).

On December 10, 2015, Eppse emailed Flores and the new UAW contacts about plaintiffs' flowback concerns, providing a list of employees seeking flowback opportunities. (*See* Doc. 20-6 at 44142). Flores replied on December 11, 2015 restating GM's reasoning for "why the people couldn't flow back, which [plaintiffs] already knew." (Doc. 20-4 at 315).

4

Eppse responded to Flores that same day, arguing that GM's purge was improper. (*See* Doc. 21-19). Flores did not respond. Undeterred, Eppse repeatedly emailed Flores with other employees' flowback concerns. Flores remained silent. (Doc. 21-3 at 326-27).

Sometime in 2016, local UAW representatives and the UAW regional director met with GM/UAW Placement Center Representative Brian Grosnickle. In a May 18, 2016 email, Eppse informed Flores that the "meeting did not bring about a resolution." (*See* Doc. 21-23).

At deposition, Eppse testified that he knew Grosnickle "wasn't going to help [plaintiffs] out." (Doc. 21-3 at 337:3-8). Yet, on June 16, 2016, Eppse requested a meeting with Grosnickle and his two UAW counterparts, hoping to "find someone with a sympathetic ear." (Doc. 21-3 at 338:1-23). The record does not indicate whether such a meeting occurred.

### C. Plaintiffs' Formal Petition to the UAW

On July 6, 2016, Eppse sent a letter[4] to UAW regional and international leadership, including Grosnickle and his counterparts, formally petitioning them for help with plaintiffs' flowback issue. (*See* Doc. 20-6 at 427-33). The letter contained a "flowback report," which identified employees who applied for but did not receive flowback opportunities, disputed GM's ability to purge applications, and cited instances where GM reinstated purged applications. (*See id.*).

The international president responded to Eppse's letter on October 13, 2016, indicating that he assigned the matter to the international vice president. (*See* Doc. 21-26). Grosnickle

---

[4] In their brief, plaintiffs deem their letter to the international executive board a "grievance." (*See* Doc. 22 at 11). But their letter is just that: a letter. It does not comply with the detailed grievance procedure in the CBA. (*See* Doc. 20-6 at 49-57). Moreover, Eppse acknowledged at deposition that he did not file a grievance about flowbacks. (Doc. 20-4 at 142:8-10).

subsequently sent Eppse a letter, dated December 5, 2016, explaining that the international vice president referred plaintiffs' concerns to him. (*See* Doc. 5-1 at 105).

In his letter, Grosnickle informed Eppse that he contacted his GM counterpart about plaintiffs' concerns.

> Her response was, "as you are aware, the Delphi Flowback Agreement, which covered UAW members employed by KBI has been reviewed multiple times by the joint parties, and it has been determined that the Company has fulfilled its obligations set forth in that agreement." Her investigation did not show any flowback issues.

(*Id.*).
Accordingly, Grosnickle concluded, the UAW "consider[ed] this matter closed." (*Id.*).

Plaintiffs, through counsel, appealed Grosnickle's conclusion in a February 1, 2017 letter to the international executive board. (*See* Doc. 20-6 at 443-44). The international executive board denied the appeal as untimely. (Doc. 20-6 at 445-46).[5]

Plaintiffs' employment ended in early February, 2017, when KBI closed the Sandusky plant. (Doc. 20-4 at 8:22-25; Doc. 20-5 at 8:3-9). Plaintiffs sued on June 5, 2017. (*See* Doc. 1).

## Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

The burden then shifts to the nonmoving party to "set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56

---

[5] Plaintiffs, again through counsel, asked the international executive board to "waive the timeliness requirement." (Doc. 20-6 at 447-49). The board denied their request. (*Id.* at 450-51).

"requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

## Analysis

"A hybrid § 301 suit implicates the interrelationship among a union member, his union, and his employer." *Garrish v. Int'l Union United Auto., Aerospace & Agric. Implement Workers*, 417 F.3d 590, 594 (6th Cir. 2005) (internal citations omitted). To succeed on their claim, plaintiffs "must prove both (1) that the employer breached the collective bargaining agreement and (2) that the union breached its duty of fair representation." *Id.* (internal citation and quotations omitted).

In a November 2, 2018, order (Doc. 19), I limited the issues on summary judgment to whether 1) plaintiffs timely filed their complaint and 2) GM breached the CBA. (Doc. 19).[6] Because I conclude, *infra*, that the statute of limitations bars plaintiffs' complaint, I do not reach the breach-of-contract issue.

"The statute of limitations for filing a hybrid Section 301/duty of fair representation claim is six months." *Wilson v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers, AFL-CIO*, 83 F.3d 747, 757 (6th Cir. 1996) (citing *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 161, 169 (1983); *Schoonver v. Consol. Freightways Corp.*, 49 F.3d 219, 221-22 (6th Cir. 1995)). Such a claim "accrues against both the union and the employer when the employee knew or should have known of the acts constituting either the employer's alleged violation or the

---

[6] Plaintiffs also argue in their brief that the UAW breached its DFR. (*See* Doc. 22 at 11-13). I decline to entertain their argument *per* my November 2, 2018 order. (*See* Doc. 19).

union's alleged breach, whichever occurs later." *Lombard v. Chrome Craft Corp.*, 264 Fed. App'x 489, 490-91 (6th Cir. 2008).

The parties dispute when plaintiffs knew or should have known that the UAW would not seek to change GM's stance on their flowback applications. Plaintiffs argue that Grosnickle's December 5, 2016 letter triggered the statute of limitations.[7] (Doc. 22 at 11). Defendants assert that plaintiffs knew or should have known of their claim well before then, and, in any event, by the time Eppse wrote his June 3, 2015 email to regional directorship. (Doc. 20-1 at 12; Doc. 21 at 12).

I agree with defendants.

### I. Plaintiffs Should Have Known the Union's Position When the Local Representative Could Not Resolve Their Concerns

"The six-month limitations period . . . begins running when the union takes an 'unequivocal position' that it will not pursue an employee's claim against the employer." *Dorn v. Gen. Motors Corp.*, 131 Fed. App'x 462, 469 (6th Cir. 2005). "The determination of the accrual date is an objective one: the asserted actual knowledge of the plaintiffs is not determinative if they did not act as reasonable persons and, in effect, closed their eyes to evident and objective

---

[7] As explained, *supra*, plaintiffs never filed a grievance about the flowback issue. In most cases, plaintiffs' failure to "exhaust any grievance . . . remedies in the collective-bargaining agreement" would doom their claim. *See Robinson v. Cent. Brass Mfg. Co.*, 987 F.2d 1235, 1238-39 (6th Cir. 1993).

Certain facts here, however, may excuse plaintiffs' neglect. First, the Flowback Agreement states that GM and the UAW would "promptly" resolve "any issues related to the implementation of this Flowback Agreement." (Doc. 206 at 405). Arguably, one could read that provision to replace the CBA's usual grievance procedure. Moreover, plaintiffs' then-local representative told them that they "couldn't file a grievance against GM" because they were KBI employees. (Doc. 20-4 at 265:14-20; *see also* Doc. 21 at 4). I therefore decline to determine whether plaintiffs' failure to follow the CBA's grievance procedure, in and of itself, bars their claim.

facts concerning the accrual of their right to sue." *Noble v. Chrysler Motors Corp., Jeep Div.*, 32 F.3d 997, 1000 (6th Cir. 1994) (internal citation and quotations omitted).

In *Fox v. Parker Hannifin Corp.*, 914 F.2d 795, 803-04 (6th Cir. 1990), the court held that plaintiff's claim accrued when a local union representative told her that conciliation efforts did not resolve her grievance and the only remaining relief, a wildcat strike, would not be successful. *Id.*

Similarly, here, plaintiffs should have known of their claim when their local union representative told them, after seeking recourse with regional and international leadership, that "there was nothing [he] could do." (Doc. 20-6 at 19-20; Doc. 20-3 at 70:18-23; Doc. 20-4 at 151:12-22). At the latest, plaintiffs should have known of their claim when Eppse documented the local representative's frustrations in his June 3, 2015 email. (*See* Doc. 20-6 at 19-20).

Plaintiffs cannot "reset the accrual date for [their] hybrid section 301 claim" by pointing to their continued efforts to seek redress from the UAW. *Fox*, *supra*, 914 F.3d at 804. (*See* Doc. 22 at 11). The local representative's statement was clear and unequivocal. Plaintiffs, disregarding that message, chose to continue trying futilely to resolve their situation outside the required process. Here, as in *Fox,* supra, 914 F.3 at 803-04, plaintiffs' "perseverance despite the lack of available relief" does not excuse their ignorance. As in *Fox*, plaintiffs' continued contact with union did not push back the claim's accrual date. *Id*.

## II. Plaintiffs Had Further Notice of Their Claim Before Grosnickle's Letter

Plaintiffs imply that Grosnickle's December 5, 2016 letter triggered the statute of limitations because it represented the union's official position. (*See* Doc. 22 at 11). But "official notification of a union's possible breach" does not start the limitations period. *Vanriper v. Local 14, Int'l Union United Auto. Aerospace & Agric. Workers*, 2015 WL 455533, *7 (N.D. Ohio)

9

(Knepp, Mag.) (citing *Bloedow v. CSX Transp., Inc.*, 319 F. Supp. 2d 782, 787 (N.D. Ohio 2004) (Aldrich, J.)). "Rather, prolonged or unreasonable delay by the union is enough to put a person on notice of the existence of her claim." *Id.*

Indeed, even assuming, *arguendo*, that the statute did not begin to run as of Eppse's June 3, 2015 email, plaintiffs had notice of their claim before receiving Grosnickle's letter.

Flores's silence in response to Eppse's repeated inquiries "should have put [plaintiffs] on notice of [their] claim." *Yates v. Memphis Bakery Emp'rs Ass'n*, 907 F.2d 151, 1990 WL 94211, *2 (6th Cir.).

The court in *Yates* held that plaintiff should have known his claim accrued when the union did not follow up on its promise to ask its lawyer whether to arbitrate plaintiff's grievance and ignored two letters plaintiff sent asking about the grievance's status. *Id.* Similarly, here, Flores, after restating GM's position, ignored Eppse's rebuttal argument. (Doc. 20-4 at 315; Doc. 20-6 at 437; Doc. 21-19). Flores remained silent in the face of Eppse's subsequent badgering. (Doc. 21-3 at 326-27).

Eppse's unanswered pleas made him think that "international was turning a blind eye." (Doc. 20-4 at 62:22). His testimony echoes the *Yates* plaintiff's sentiment that "he was 'getting the runaround.'" *See* 1990 WL 94211 at *2. Flores's silence, in light of Eppse's testimony, should have opened plaintiffs' eyes to their claim. (Doc. 20-4 at 62:22; *see also* Doc. 21-3 at 338:15-17).

Eppse's May 18, 2016 email also shows that plaintiffs knew the UAW would not press GM for further relief. In that email, Eppse complained that local and regional representatives had an unsuccessful meeting with Grosnickle. (*See* Doc. 21-23). At deposition, Eppse acknowledged

that he knew then that Grosnickle "wasn't going to help [plaintiffs] out." (Doc. 21-3 at 337:6-8). Grosnickle's letter seven months later only confirmed Eppse's belief.

Finally, on June 16, 2016, despite knowing Grosnickle's position, Eppse wrote him and his counterparts in hopes of "find[ing] find someone with a sympathetic ear." (Doc. 21-3 at 338:12-18). The record shows no response to Eppse's plea, and his persistence does not delay the statute of limitations. *See Fox*, *supra*, 914 F.2d at 803-04.

Plaintiffs had – but disregarded – ample opportunity to learn of their claim against the UAW before Grosnickle sent his December 5, 2016 letter. [8] Accordingly, I dismiss their claim as untimely.

## Conclusion

It is, therefore,

ORDERED THAT

Defendant GM's motion for summary judgment (Doc. 20) and defendant UAW's motion for summary judgment (Doc. 21) be, and the same hereby are, granted.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

---

[8] Defendants argue that, even assuming that Grosnickle's December 5, 2016 letter triggered the statute of limitations, plaintiffs' complaint is untimely because it was filed six months and one day from that date. (Doc. 201 at 13). The record does not indicate, however, the date on which plaintiffs received that letter, which Grosnickle presumably sent via regular mail. I decline, then, to find plaintiffs' complaint untimely on that basis.

11